**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 05-06477-JW |
| Hotel Associates, LLC, | Chapter 11 |
| Debtor. | ORDER ON MOTION TO VALUE SECURED CLAIM |

This matter comes before the Court upon the hearing on a Motion to Value Secured Claim under 11 U.S.C. §§ 506(a) & (d) ("Motion") that was filed by Hotel Associates, LLC ("Debtor"). In the Motion, Debtor seeks to value the secured claim held by LaSalle Bank National Association, Trustee for the Certificateholders of Mortgage Capital Funding, Inc. Multifamily Commercial Pass-Through Certificates Series 1997 MC-1 ("Trust"). CRIIMI MAE Services Limited Partnership ("CMSLP") participates in Debtor's bankruptcy proceedings as special servicer of the Trust's secured claim. The issue for the Court to determine is the value of Debtor's primary asset, a 186 room hotel located in Columbia, South Carolina. In light of the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1. Debtor owns and operates a one hundred eighty-six (186) room, full-service hotel[1] ("Hotel") located in Columbia South Carolina. The Hotel, which was built in 1986, has a restaurant and lounge; 4,126 square feet of meeting space that includes a 3,526 square foot ballroom that is divisible in four rooms; an outdoor swimming pool; indoor spa and

---

[1] Apparently, a full-service hotel is a lodging facility that offers and profits from food and beverage services through a restaurant located on the hotel property, meeting spaces, and other amenities. A limited-service hotel primarily offers and profits from lodging services.

sauna; a fitness room; and hotel and guest laundry facilities. The Hotel is designed as a six story high rise building situated upon approximately 4.69 acres of land.

2.   CMSLP services a mortgage held by the Trust. The parties agree that the mortgage is a properly perfected first priority lien that encumbers the real and personal property comprising the Hotel. The Trust's mortgage secures a $5,584,000.00 loan made to Debtor on or about March 1997.

3.   On June 3, 2005, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. Debtor currently operates and manages the Hotel and related assets as a debtor-in-possession.

4.   On September 29, 2005, CMSLP, on behalf of the Trust, asserted a $6,540,868.44 claim against Debtor's bankruptcy estate.

5.   On October 20, 2005, Debtor filed the Motion to which CMSLP filed an objection. Following the objection raised by CMLSP, the Court held an evidentiary hearing on the Motion in order to determine that value of the Hotel, the primary collateral securing the claim being serviced by CMSLP.

6.   During the hearing, Debtor presented the testimony David Boyd ("Boyd"), a hotel management consultant, and E.L. Pooser, Jr. ("Pooser"), a managing member of the Debtor.

7.   The Court recognized Boyd as an expert in the field of hospitality consulting and management. Specifically, the Court allowed Boyd to testify with respect to the market performance of the Hotel and its prospects in attracting corporate clientele.

8.   Boyd testified that the Hotel was in a declining condition that caused a shift in the Hotel's clientele from the more lucrative corporate market segment to military customers

2

primarily associated with the nearby Fort Jackson army base.[2] Given the change in the market segment, Boyd recognized that the Hotel was underperforming when compared to other full-service hotels. Accordingly, Boyd concluded that since the majority of the Hotel's clientele were from the military market segment, the Hotel's average daily rate could not improve and profitability would decline.

9.   Boyd observed that the restaurant and lounge at the Hotel is in poor condition and is not an attractive amenity for the Hotel's guests.

10.  Pooser's testimony corroborated the observations of Boyd. As Debtor's manager, Pooser observed the declining condition of the Hotel, and noted the change in the Hotel's customer base. Pooser emphasized that the current condition of the Hotel prevented it from attracting corporate clients, a group that according to Pooser is more likely to take advantage of the amenities of a full-service hotel. Pooser noted that military customers at the Hotel do not take advantage of the Hotel's food and beverage services or meeting spaces to any great degree. Thus, the military clientele that the Hotel attracts is not as profitable as the corporate guests that are likely to utilize the Hotel's food and beverage services and other amenity type services during their stay at the Hotel.

11.  Pooser also explained that the Hotel required certain improvements in order to remain flagged or affiliated with the Ramada brand.[3] Furthermore, Pooser emphasized that other capital improvements to the Hotel were required to attract more

---

[2]    It appears that the parties generally recognize following three types of customers for the Hotel:
   1. Corporate customers or business travelers that are generally willing to pay for the additional amenities provided by the Hotel;
   2. Military customers from nearby Fort Jackson that stay at the Hotel, but which do not take advantage of the additional amenities provided at the Hotel; and
   3. Leisure travelers or tourists who do not regularly stay at the Hotel.

[3]    The affiliation of the Hotel with a nationally recognized brand such as Ramada is a sign of quality and increases the value of the Hotel, depending on the brand. The record indicates that Ramada has threatened cancellation of its affiliation with the Hotel due to its poor operating condition. Furthermore, Debtor is considering the possibility of changing its flag/brand affiliation.

3

corporate/business clientele. Pooser estimated that the cost of certain improvements ranged from $176,000.00 to upgrade the Hotel's linens to $1,849,114.00 for a complete renovation of the Hotel. Pooser did not present any written quotes or estimates from third party vendors or contractors.

12. In light of the testimony provided by Boyd and Pooser, it appears that the Hotel is an underperforming facility that is currently operating more like a limited-service hotel because the military market that comprises the majority of the Hotel's clientele is less likely to take advantage of the Hotel's food and beverage services and other amenities such as the Hotel's meeting spaces and banquet facilities. Therefore, the market mix and condition of the Hotel indicate that the Hotel is a higher risk investment when compared to full-service facilities.

13. Without objection from either Debtor or CMSLP, the Court also recognized Thomas F. Wingard ("Wingard") of Wingard and Associates and Gregory Kendall ("Kendall") of the Real Estate Research Corporation as expert witnesses in the field of real property appraisal. Wingard served as Debtor's expert appraiser. Kendall served as CMSLP's expert.

14. Wingard and Kendall agreed that the sales comparison approach and income capitalization approach were the most appropriate methods to value the Hotel. Furthermore, they both gave more weight to the value indicated by the income capitalization approach when determining a final value for the Hotel.

### Income Capitalization Approach

15. The "income capitalization approach" is comprised of the "direct capitalization method" and the "yield capitalization method," which is also known as the "discounted

cash flow method."[4]  Under either method, future net operating income ("NOI") is forecasted and then capitalized at a rate of return ("cap rate") that will be sufficient to attract investors.  See In re Southmark Storage Assocs. Ltd., 130 B.R. 9, 11 (Bankr. D. Conn. 1991) ("The capitalization rate reflects the rate of return expectations of a typical investor.").  The estimated NOI is calculated by subtracting forecasted operational expenses from forecasted revenue.  No adjustments are made for debt service.  The selected cap rate is dictated by market forces and the prospective investor's perceived risk in investing in or purchasing a given property.  Generally, higher risk investment properties will have a higher cap rate than lower risk investment properties.  Since NOI and the selected cap rate are estimated, assumptions with respect to the forecasted revenues and expenses for the property and the selected cap rate must be closely examined because each factor has a significant impact on the final value assessed under the "income capitalization approach."

16.  Wingard and Kendall gave primary weight to the value indicated by the income capitalization approach because the Hotel's ability to produce income was the primary characteristic that motivated investors to assess a value to the Hotel in hopes of purchasing it in the open market.

---

[4]  The court, in Windsor Hotel, L.L.C., defined the "direct capitalization method" and "yield capitalization method" as follows:
> Under [the "direct capitalization method"], . . ., the estimate of single year's income expectancy at a projected stabilized income level, or an annual average of several year's income expectancies, is converted into an estimate of value by dividing that figure by an overall capitalization rate.
>
> * * * *
>
> In contrast, in the ["yield capitalization method"], the annual cash flow and sale proceeds over a typical holding period are converted into a value estimate by discounting to present value.  This method is based upon earnings projections over a longer period of time and the predicted value can vary greatly depending upon the discount rate used.

295 B.R. 307, 310-11 (Bankr. C.D. Ill. 2003).

5

17.     Both Wingard and Kendall utilized the "direct capitalization method;" however, only Kendall provided an analysis of value using the "yield capitalization method." Since Wingard only utilized the "direct capitalization method" for his "income capitalization approach" analysis, the Court will limit examination of each appraiser's "income capitalization approach" to the "direct capitalization method."[5] This measure shall ensure a more reliable comparison of the assumptions made by each appraiser. Furthermore, the Court will only consider the "as is" valuation provided by Kendall's "direct capitalization" as opposed to the value "at stabilization"[6] because the "as is" figure represents a value for the Hotel that is closest to the date of the hearing.

18.     Wingard valued the Hotel at $5.2 million after calculating a value of $5.133 million using the "income capitalization approach" and $5.394 million under the "sales comparison approach."

19.     Overall, Kendall valued the Hotel at $8.02 million dollars. Applying the "yield capitalization approach," Kendall determined that the "as is" value of the Hotel was $8.02 million. However, under the "direct capitalization approach," Kendall determined that the value of the Hotel was $7.96 million.[7] Under the "sales comparison approach," Kendall valued the Hotel at $7.86 million.

---

[5]     This should not be construed as the Court's preference for the direct capitalization method over the yield capitalization method.

[6]     Although not clearly defined by Kendall, the court in In re Windsor Hotel, L.L.C. noted the following:
> As defined by the Appraisal Institute in *The Appraisal of Real Estate (10th ed. 1992)*, . . ., "[s]tabilized occupancy or income is defined as occupancy or income at that point in time when abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the property."

295 B.R. at 307 (quoting Prudential Ins. Co. of America v. Parsippany-Troy Hills, Tp., 16 N.J. Tax 58 (1995)) (citation omitted).

[7]     The Court attributes the differences in values between Kendall's "yield capitalization method" and the "direct capitalization method" to the $40,000 deduction for "Deferred Maintenance" considered in his

6

20.   In order to arrive at $5.133 million under the "direct capitalization method," Wingard made the following assumptions in order to calculate a value for the Hotel:

    a.   The Hotel's stabilized future occupancy rate is 70% of its annual capacity of 67,890 rooms;[8]

    b.   The average room rate is $67.00;

    c.   The applicable cap rate for the Hotel is 11.5%; and

    d.   Estimated total revenues are $4,692,791 and estimated total expenses are $4,102,523; and thus, NOI is $590,268.[9]

21.   In valuing that Hotel at $7.96 million under the "as stabilized" "direct capitalization method," Kendall assumed the following:

    a.   The Hotel's stabilized future occupancy rate is 75% of its annual capacity of 67,890 rooms;

    b.   The average room rate is $66.75;

    c.   The applicable cap rate for the Hotel is 10.5%; and

    d.   Estimated total revenues are $5,080,000 and estimated total expenses are $4,240,000; and thus, NOI is $840,000.

22.   The critical differences in the assumptions made by Wingard and Kendall are in the selected cap rate, the forecasted occupancy rate, and the estimated NOI to be capitalized.

23.   Although the <u>Korpackz Real Estate Investor Survey</u> that Wingard cited in his appraisal indicated that the average cap rate for the national full-service hotel market was 9.22%, Wingard believed that a cap rate of 11.5% was more appropriate because the

---

"direct capitalization" analysis. Without the $40,000 deduction, Kendall's "direct capitalization analysis" values the Hotel at $8,000,000.

[8]   The total number of rooms available at the Hotel for a given year is its number of rooms (186) times the number of days in a year (365).

[9]   The Court notes that Wingard and Kendall rounded some figures. However, upon review of each appraisal the rounding had a negligible effect on the final valuation figures provided.

7

declining physical condition of the Hotel and loss of the more lucrative corporate market segment made the Hotel a riskier investment as compared to full-service hotels in the market. Kendall also recognized that the Hotel was a riskier investment as compared to full-service hotels in the market, but selected a cap rate of 10.5%. However, in light of the testimony of Boyd and Pooser with respect to the condition of the Hotel, Wingard's selection of 11.5% is more reasonable than the 10.5% selected by Kendall. Therefore, the Court adopts Wingard's 11.5% cap rate for purposes of calculating a value for the Hotel.

24. Given the declining condition and current market mix of the Hotel, Wingard's selection of an annual occupancy rate of 70% is also adopted by the Court.

25. The differences between the estimated NOI that Wingard and Kendall used is largely the result of differences in their estimated occupancy rates for the Hotel. The clearest example of this difference is evident in a comparison of each appraiser's revenue and departmental expenses estimates. Since revenue and departmental expenses are directly affected by the Hotel's occupancy, the difference between the NOI calculated by each appraiser is understandable in light of the fact that Kendall's 75% occupancy estimate is higher than Wingard's 70% occupancy estimate.

26. However, despite the obvious difference in occupancy rates, a closer examination of each appraiser's method of calculating revenues and expenses indicates key

8

differences in the way the appraisers estimated administrative and general expense,[10] franchise fees,[11] and amounts deducted for a reserve replacement account.[12]

27. In order to estimate the Hotel's expenses for purposes of estimating the Hotel's future NOI, Wingard relies upon year end 2003 and year end 2004 operating data for the Hotel, industry averages provided by the Host Study,[13] and forecasts from the Hotel's management. Although Wingard cites to forecasts from Hotel's management as a source for estimating expenses, the Court notes that Wingard did not include or document the forecasts in his appraisal.

28. When compared to Wingard's appraisal, the Court notes that Kendall documents the information that he used for his expense estimates. Kendall relied upon the Hotel's historical operating data for year end 2002, year end 2003, year end 2004, year to date September 2004, and year to date September 2005. Kendall also referenced industry averages as provided by Trends in the Hotel Industry[14] ("PKF Report"), and the Hotel's 2006 Budget.

29. The historical operating data that Wingard utilized indicated that administrative and general expense ranged from 12.7% of total revenue for year end 2003 to 13.6% of

---

[10] The only description of administrative and general expense is provided by Kendall. Kendall describes administrative and general expense as "salaries and benefits of the general manager and staff, credit card commissions, professional fees, bad debt, data processing, general liability insurance, accounting audits, and executive office expenses."

[11] In describing franchise fees, Kendall notes that "Cendant, the franchisor of the subject property, charges royalty fees of 3% of room revenues, an amount typical of [the Ramada] brand." Wingard did not provide a description of franchise fees and, unlike Kendall, calculated franchise fees as a percentage of total revenues rather than room revenues. Neither expert presented a clear explanation of the differences in their approaches to estimating such expenses.

[12] Reserve replacement, as described by Kendall, is an expense that "represents the creation of a reserve account that is set aside to provide for the periodic replacement of capital items including furniture, fixtures, and equipment during the life of the building." In estimating NOI for valuation purposes, Wingard did not make an expense deduction for reserve replacement.

[13] The Host Study is an industry report on the hotel market that is produced by Smith Travel Research, a company that studies the market and financial performance of hotels.

[14] Trends in the Hotel Industry is an industry report compiled by the PKF / The Hospitality Research Group that includes operating data from 2004.

total revenue for year end 2004. The historical operating data cited by Wingard also indicated that franchise fees were approximately 4.6% of total revenue for year end 2003 and 4.8% of total revenue for year end 2004. The Host Study indicated that the industry averages for administrative and general expense range from 8.1% to 9.9% of total revenue, and that franchise fees range from .5% to 1.1% of total revenue. In light of the information cited in his appraisal, Wingard estimated that the Hotel's administrative and general expense is $610,063 or approximately 13% of his estimate for total revenue ($4,692,791). Wingard estimated franchise fees as 4.5% of his estimated total revenue or $211,175. Wingard acknowledges that administrative and general expense as 13% of total revenues is outside of the industry averages cited in his appraisal, but does not offer any explanation for the variance.

30.     Kendall disclosed that the average for administrative and general expenses, pursuant to the Hotel's operating history from year end 2002 to September 2005, ranged from 8.1% of total revenue to 8.8% of total revenue with a high of 9.8% of total revenue at year end 2004. Furthermore, for that period, franchise fees were 3% of room revenue. The PKF Report noted by Kendall showed administrative and general expense industry averages ranging from 9.4% to 10.3% of total revenue; while industry averages for franchise fees ranged from 3.5% to 4.9% of room revenue. The 2006 Budget that Kendall obtained from the Hotel's management indicates estimated administrative and general expense for 2006 as 9.7% of total revenue and franchise fees as 3.1% of room revenue. Based thereon, Kendall estimated administrative and general expenses as 7.7% of his estimate of total revenue or approximately $391,000 and franchise fees as 3% of his estimate for room revenue ($3,391,000) or approximately $102,000, which is

approximately 2% of Kendall's estimate of total revenue ($5,080,000). A prior appraisal of the Hotel by Kendall noted that the range for administrative and general expense as a percentage of total revenue for three comparable hotel properties, which were not considered in Kendall's most recent appraisal, was 9.7 % to 14.6%.

31.    Accordingly, in light of the information and credible testimony provided by both appraisers, the Court concludes that the estimated administrative and general expense for the Hotel should be 10.8% of its estimated total revenue.

32.    The Court notes that Wingard and Kendall use two different methods for estimating franchise fees. Wingard estimates franchise fees as 4.5% of his estimate for total revenues. However, Kendall estimates franchise fees as 3% of his estimate of room revenue. Given the fact that the industry averages for franchise fees as listed in the <u>PKF Report</u> range from 3.5% to 4.9% of room revenue and that Wingard estimated franchise fees as 4.5% of total revenues, the Court finds that franchise fees should be estimated as 3.5% of total revenues.[15]

33.    Under Wingard's direct capitalization analysis, estimating administrative and general expense as 10.8% of total revenue and estimating franchise fees as 3.5% of total revenue increases Wingard's calculation of NOI to $740,437.[16] Capitalizing $740,437 by the 11.5% cap rate that Wingard selected results in an indicated value of $6,438,584 under this revised "direct capitalization analysis."

---

[15]    The Court notes that franchise fees estimated as 4.9% of *room revenue* is approximately 3.33% of *total revenue* under Wingard's analysis. In the absence of a better explanation of the variance between Wingard and Kendall's estimate of franchise fees, the Court believes that estimating franchise fees as 3.5% of total revenue is reasonable.

[16]    NOI and expenses have a dollar-for-dollar inverse relationship. Thus, NOI increases by a dollar for every dollar decrease in a given expense.

11

34. Revising Kendall's "as is" "direct capitalization" analysis to include Wingard's assumptions with respect to occupancy rate, cap rate, and the Court's estimates for calculating administrative and general expense at 10.8% of total revenue and franchise fees at 3.5% of total revenue decreases Kendall's calculation of estimated NOI.[17] In his analysis, Kendall includes a reserve for replacement expense that will be used to provide capital improvements to the Hotel such as purchasing new furniture, fixtures, and equipment. However, the Court concludes that the reserve replacement should not be presently included as an expense in this analysis because funds set aside for a reserve replacement account would be directly reinvested into the Hotel and would increase the value of the Hotel by improving its condition.[18] Accordingly, the reserve for replacement expense, which Kendall estimates is 4% of total revenues, shall be excluded. Furthermore, an expense for Rentals and Other revenues must be estimated and deducted from Kendall's calculation of total revenues. Thus, a departmental expense for Rentals and Other revenues of 50% of estimated Rentals and Other revenue in light of a 70% occupancy rate shall be included in Kendall's NOI calculation. The net result of the changes produces $736,000 as an estimate of NOI, which if capitalized at 11.5%, provides an "as stabilized" value of $6,400,000 of the Hotel.

35. Given the range of values provided by each appraiser's adjusted "direct capitalization" analysis, the Court concludes that $6.4 million is the proper indicated value for the Hotel under the "income capitalization approach."

---

[17] Since Kendall rounds to the nearest $1,000 for all the figures that he provided in his calculations of NOI, the Court also rounded its figures when making adjustments to Kendall's "as is" "direct capitalization" analysis.

[18] The Court also notes that based upon the testimony of Boyd and Pooser, upgrading or making capital improvements to the Hotel would allow it to attract more corporate/business clientele. Therefore, capital improvements would increase the value of the Hotel because the more lucrative corporate/business customers would be likely to utilize more of the Hotel's amenities.

### Sales Comparison Approach

36. The "sales comparison approach" to valuation entails comparing a subject property (in this case the Hotel) to comparable or similar properties. In order to reach a value for the subject property, the sales transactions of the comparable properties are analyzed. Thereafter, the purchase price for the comparable properties is adjusted to account for differences between the comparable properties and subject property with respect to their age, location, condition, and physical characteristics.

37. Since the selection of comparable properties and the adjustments to their sales price bear significantly upon the ultimate value established for a subject property, the comparable properties selected and the means of adjusting their sales price must be closely scrutinized

38. With respect to the sales comparison approach utilized by each appraiser, the Court finds that the set of comparable properties selected by Wingard are located in closer proximity to the Hotel in that they are in South Carolina or a neighboring state. Additionally, Wingard selected a mix of limited-service hotels and full-service hotels for his set of comparable properties.[19] Given that the Hotel's full-service amenities are underutilized because of the Hotel's clientele and condition, Wingard's inclusion of some

---

[19] The Court notes that Wingard utilized limited-service hotels when determining the room rate and occupancy rate of the Hotel in his "income capitalization approach." However, Wingard did not include those properties in his set of comparable properties in his "sales comparison approach." The nine properties that comprise the comparable set of properties that Wingard utilized for his "sales comparison approach" are as follows:
  1. Columbiana Hotel and Conference Center located in Columbia, South Carolina
  2. Comfort Suites Hotel located in Columbia, South Carolina
  3. Hampton Inn located in Beaufort, South Carolina
  4. Fairfield Inn located in Savannah, Georgia
  5. Hampton Inn and Suites located in Pineville, North Carolina
  6. Holiday Inn located in Savannah, Georgia
  7. Hilton located in Charlotte, North Carolina
  8. Hampton Inn located in Matthews, North Carolina
  9. Radisson located in North Charleston, South Carolina.

13

limited-service facilities is appropriate under the circumstances. On the other hand, Kendall only selected full-service hotels for his set of comparable properties, and unlike Wingard, Kendall included three hotels that are not in close proximity to the Hotel (one is located in Texas and two others are located in Florida). In light of these differences, the Court concludes that Wingard's set of comparable properties provides the best means to determine the value of the Hotel under the sales comparison approach to valuation.

39. Although the Court will use the hotels that Wingard selected for the sales comparison approach, the Court accepts the method by which Kendall makes adjustments to the sales price of comparable hotels in order to calculate an indicated value for the Hotel. Kendall adjusts the given sales price per room of a comparable hotel in light of the difference between the NOI per room of the comparable property and the NOI per room of the Hotel. Kendall contends that comparing the NOI per room of a given comparable hotel with the NOI per room for the Hotel provides a more objective adjustment to the sales price per room of the comparable property because the variance between the comparable property's NOI and the Hotel's NOI is a measure of market's perception of the two properties' age, condition, location, and physical characteristics.

40. Based upon his personal observations of the comparable properties selected and the Hotel, Wingard decreased the sales price per room for each property in order to calculate a sales price per room for the Hotel in light of his observed differences in the age, condition, location, and physical characteristic between the comparable properties and the Hotel. Thus, when compared to Kendall's method of calculating adjustments to the sales price per room of comparable properties, Wingard's method of making

14

adjustment appears more subjective and is not as persuasive as Kendall's method of analysis.

41. After adjusting each of the appraiser's calculations for NOI in light of the Court's conclusions concerning occupancy and expenses, NOI per room can be estimated for purposes of determining the proper adjustment to be made to each comparable property's sales price per room. The NOI produced after adjusting Wingard's calculations is $740,437 while the NOI produced after adjusting Kendall's calculations is $736,000. Given the range of the two figures, the Court concludes that the proper NOI for consideration is $738,000 which yields $3,968 of NOI per room.

42. Comparing the $3,968 NOI per room of the Hotel to the NOI per room of the comparable properties that Wingard selected and then making the adjustments to each of the comparable properties' sales price per room yields a range of adjusted sales prices per room from a low of $29,440 to a high of $55,425. Applying the same analysis to the twelve (12) auxiliary properties[20] that Wingard provided yields a range of adjusted sales price per room from a low of $25,750 to a high of $44,641. In light of the range of adjusted sales prices per room indicated under the Court's analysis and in consideration of all other evidence presented, the Court finds that $33,600 is a reasonable adjusted sales price per room for the Hotel. Therefore, under the sales comparison approach the Court finds that a reasonable value for the Hotel is $6,249,600 or $6.25 million.

---

[20] In order to demonstrate the reasonableness of his conclusion under the sales comparison approach Wingard provided financial and sales price information of an additional 12 properties. Although Wingard referenced the sales information and financial information for the auxiliary properties, he made no adjustments the sales price per room for each property. However, given the NOI data and number of rooms listed for each auxiliary property cited by Wingard, the Court can apply its analysis to these properties and determine an adjusted sales price per room that would reflect a value for the Hotel.

15

43. The indicated value produced by the adjusted sales prices for all of the comparable properties examined provides a range of value from a low of $4,789,500 ($25,750 x 186) to a high of $10,309,050 ($55,425 x 186). Although there is wide disparity in the range, the range of values indicate that the $6.4 million value determined under the Court's adjusted "income capitalization" analysis and $6.25 million value recognized by the Court under its "sales comparison" analysis is reasonable.

### Conclusion

44. In light of the $6.4 million value provided under the Court's adjusted "income capitalization approach" for Wingard and Kendall, the $6.25 million value provided the Court's sales comparison analysis, and the intended use of the Hotel as a going concern in this reorganization, the Court concludes that a reasonable value for the Hotel in light of the evidence presented is $6.37 million given the age, location, customer base, and physical condition and characteristics of the Hotel.

45. In addition, the parties have stipulated that the value of certain current assets should be added to the final value that the Court establishes for Creditor's secured claim. During the hearing, Debtor acknowledged that $200,000 held in a reserve account should be added to the value of the secured claim. However, the parties disagreed with respect to how the current assets should be included in a final determination of value for the claim. Debtor contends that current liabilities associated with postpetition accrued operational expenses (excluding amounts for prepetition trade accounts payable, accrued interest expense, current notes payable to Pooser, accrued property taxes, and current payments to an Orix Real Estate mortgage) and amounts escrowed for property insurance and property taxes should be subtracted from the amount of current assets in existence at

confirmation of Debtor's plan. Conversely, CMSLP contends that the entire balance for current assets, as indicated on Debtor's November 30, 2005 balance sheet, should be added to the final value established for the claim.

46.     Rather than argue the issue at the valuation hearing, the parties submitted briefs. As a preliminary matter, the Court notes that none of the cases cited by the parties specifically addressed the treatment of current assets and current liabilities in the context of a § 506 valuation. Nevertheless, both parties have agreed to decide the issue of additional value by referring to Debtor's balance sheet. Therefore, to the extent that the balance sheet can be utilized to assess the relative interests of CMSLP and Debtor in the postpetition current assets, the Court shall make a determination of the issue in light of the most current financial information available at the confirmation hearing.

**AND IT IS SO ORDERED.**

UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina,
February 10, 2006